UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

NYKA O'CONNOR,

         Plaintiff,

v.                                   Case No. 3:17-cv-1007-BJD-JBT

DR. GANZALO ESPINO and
NURSE ROBINSON,

         Defendants.

_____

## **ORDER**

### I.   **Status**

Before the Court is Defendant Espino's Amended Motion for Summary Judgment (Doc. 145) with exhibits (Docs. 116-5 to 116-6, 145-1 to 145-4). Plaintiff filed a Response (Doc. 146) with exhibits (Docs. 146-1 to 146-17). Espino filed a Reply (Doc. 150), and Plaintiff filed a Sur-Reply (Doc. 158). Espino also filed Objections to Plaintiff's Summary Judgment Evidence (Doc. 149), to which Plaintiff filed a Response (Doc. 157). Finally, Plaintiff filed a Motion for Leave to File Belated Motion for Summary Judgment against Nurse Robinson (Doc. 137) and attached thereto his proposed motion for summary

judgment and exhibits (Doc. 137-2). Nurse Robinson did not respond. The motions are ripe for review.[1]

## II.    Plaintiff's Allegations in Amended Complaint[2]

According to Plaintiff, on April 23, 2017, he "had a serious health need to be referred to a [medical doctor] by Nurse Robinson for his complaints of gastro pains [and] cramps, bloody toilet tissue with stools, [and] large quantity of blood in the toilet [that] she saw." Doc. 57 at 12. Nurse Robinson, however, advised Plaintiff "that nothing [wa]s wrong with him because [he] 'waited until the weekend when nobody [wa]s here to complain,'" gave Plaintiff a sick-call form and "nothing more." Id. Plaintiff claims Robinson was deliberately indifferent for failing to refer him to a medical doctor and because of her actions, he suffered "continuous pains, cramps, def[e]cating bloody stools, etc, she witnessed; [and] stress, anxiety, agitation of the chemical imbalance in [his] brain, depression, etc." Id.

Plaintiff further alleges that he had "a serious health [and] life need for a non-standard therapeutic diet" to meet his "sincere SYDA-Jewish Vegetarian Belief System [and] health issues." Id. He claims that this "Belief System

---

[1] For ease of reference, the Court cites the document and page numbers as assigned by the Court's electronic case filing system.

[2] The Court summarizes the allegations as to the remaining Defendants only.

requires peanut butter, bread, cereal, milk, whole fruits, vegetables, etc, (which was [and] is being denied); while prohibiting meat, fish, eggs [and] sour foods e.g., cheese." Id. at 13. On May 8, 2017, Plaintiff told Dr. Espino that "he was on a hunger strike due to the deficient meals served, contrary to his health [and] religious needs."[3] Id. at 18. Plaintiff explained that he needs a combination of three diets: (1) "a low residue (low fiber) diet for his inability to adequately breakdown certain indigestible carbohydrates, which cause acid reflux that leads to esophageal cancer [and] tumors, heartburns, indigestion, sour stomach [and] sour belch, etc."; (2) "a fat intolerance (low fat) diet for his nausea [and] cholesterol gallstones [and] gallbladder walls thickening, for which UCI doctors approved surgery in 2015 but wasn't done, [and] gallstones can clog gallbladder opening, impair flow, cause infection [and] er[]uption, spread infection [and] kill him"; and (3) a "vegetarian diet for his sincere SYDA-Jewish Tenets . . . which require peanut butter, bread, cereal, milk, whole fruits, vegetables, etc. [and] which prohibit[] meat, fish, eggs, sour foods like cheese, etc., which [Plaintiff] is [and] was subjected to eat." Id. Espino

---

[3] Plaintiff was on the hunger strike from May 4, 2017 to May 8, 2017. Plaintiff wrote, "From 3-4-17 when O'Connor announced his hunger strike until 5-8-17, when he came off hunger strike . . . ." Doc. 57 at 17. Based on the totality of Plaintiff's allegations and evidence submitted, Plaintiff clearly meant May 4, 2017, not March 4, 2017. See, e.g., id. at 5 (listing dates of events giving rise to his claims as April to August 2017); id. at 15 ("Said day 5-4-17, O'Connor advised Nurse Clarkson at am, noon [and] pm med rounds, that he's going on a hunger strike . . . .").

advised Plaintiff that he needed to choose one diet, so Plaintiff "involuntarily asked for a low-residue – alternate – no eggs – no cheese" diet. Id. "Dr Espino had food service staff Ms. Graham present, who stated all therapeutic diets have an alternate [and] that eggs, etc., could be replaced with peanut butter for his religion." Id. Plaintiff claims that "Dr. Espino was deliberately indifferent by writing a low residue alternate no eggs, no meat diet instead of initiating the protocol for a non-standard therapeutic diet." Id. Plaintiff claims that he was forced to choose between his health and religion when Espino told him he could choose only one diet, and that such action violates his rights because a dietician could simply formulate an adequate non-standard therapeutic diet for him. Id. at 18-19. Moreover, Plaintiff claims Espino was "deliberately indifferent by failing to re-write [his] medical gastro med[ication]s sought 5-8-17 that were discontinued on [5]-4-17 when [Plaintiff] declared a hunger strike, where Dr. Espino advised [Plaintiff] to resume eating before he renewed said gastro med[ication]s." Id. at 18.

On May 30, 2017, Plaintiff submitted "an inmate request, sick-call [and] SYDA correspondence about vegetarian diet to Nurse Johnson" regarding the need to correct his diet. Id. at 19. He did not receive a response, so he filed a formal grievance regarding his "deficient diet." Id. "As reprisal for said formal grievance, Dr. Espino on about 6-13-17 was deliberately indifferent [and]

discontinued said diet [that] he wrote [on] 5-8-17, and stated [Plaintiff] should get on a Vegan or [Religious Diet Plan (RDP)]" diet, which, according to Plaintiff, "are both insufficient for [his] health [and] religion." Id. Plaintiff asserts that he was exercising his rights when he filed the grievance, and "Dr. Espino took adverse action as a result by invalidating said diet pass." Id.

On June 14, 2017, Plaintiff saw Dr. Espino and "inquired why the low res. alt. no eggs – no meat [diet] pass of 5-8-17 wasn't corrected but invalidated with directions to eat Vegan or RDP." Id. at 20. Plaintiff claims that "Dr. Espino was deliberately indifferent by falsely advising said pass was still valid." Id. Plaintiff asked for "adequate meds (Tums, Nexium, etc.) for his gastro issues . . . to no avail, when Dr. Espino was deliberately indifferent by advising him that Tums is just candy [and] Nexium is too costly and denied same." Id. Dr. Espino continued his deliberate indifference by stating it is only Plaintiff's "'perception' of pain [and] cramps," and he told Plaintiff to "'shut up.'" Id. Dr. Espino was further deliberately indifferent when he told Plaintiff that, based on a 2016 colonoscopy, Plaintiff "had no gallstones [and] isn't def[e]cating blood." Id. Plaintiff requested another ultrasound, which Dr. Espino refused to order. Id. at 21. Dr. Espino harassed Plaintiff and told him that because he was "'suing us,'" he would not provide Plaintiff with any care

until he sees the Court order to which Plaintiff kept referring.[4] Id. at 21. Plaintiff states that "Dr. Espino took adverse action to hinder" his lawsuit and grievance about his gastro and religious issues, and had it not been for Plaintiff's June 14, 2017 grievance with the Court's June 2, 2017 order attached, "Dr. Espino probably would have provided some treatment for his health issues." Id.

As relief, Plaintiff seeks a declaratory judgment that the acts and omissions of all Defendants violated his rights, "[d]amages allowed by the laws," appointment of counsel, and "other relief proper." Id. at 5.

### III.   Parties' Summary Judgment Positions

#### a. Defendant Espino's Motion and Exhibits

Defendant Espino argues that Plaintiff's Eighth Amendment claims about his diet and medications are "refuted by the indisputable record evidence." Doc. 145 at 11. He argues that Plaintiff "cannot demonstrate the existence of an objectively serious medical need" with respect to the requested medications, and "there is no evidence Dr. Espino was subjectively aware of any such need." Id. at 15. Espino contends that he "exercise[d] his medical

---

[4] Plaintiff was referring to an order in one of his prior cases. See Doc. 57 at 21. The order was entered on June 2, 2017, directing the defendants to file a notice advising whether Plaintiff had gallbladder surgery. See Order (Doc. 121), No. 3:15-cv-1387-TJC-JBT (M.D. Fla.).

judgment in determining how to treat [Plaintiff]'s complaints." Id. at 16. As to Plaintiff's diet request, Espino contends that Plaintiff never requested that Espino prescribe him the specific diet Plaintiff requests in the Amended Complaint. Id. at 17. Even if he had, Espino asserts that pursuant to the Florida Department of Corrections (FDOC) procedures, "Espino could only prescribe diets for medical reasons"—not based on an inmate's religious beliefs. Id. at 18. He also argues that Plaintiff's requested therapeutic diets "conflicted with his religious dietary preferences," and Espino determined that Plaintiff "was not entitled to a therapeutic diet because no such diet was medically necessary." Id. Moreover, Espino was not responsible for creating menus or diets. Id. at 19.

As for Plaintiff's Free Exercise claim regarding his diet, Espino contends that "[t]here is no evidence Dr. Espino substantially burdened [Plaintiff]'s sincerely held religious beliefs by denying his request for a diet that met his religious dietary preferences." Id. at 20. He claims that he "attempted to accommodate [Plaintiff]'s religious beliefs within the confines of his authority," but per FDOC policy, he "could not prescribe a diet based on [Plaintiff]'s religious dietary preferences." Id. He asserts that he initially "prescribed the exact diet requested by [Plaintiff] . . . to end his hunger strike," but then Plaintiff requested a change (no cheese) to accommodate his religion. Id.

"Espino could not prescribe this change . . . because he did not believe it was medically necessary, . . . [so] he discontinued the unnecessary therapeutic diet so [Plaintiff] could get on an RDP." Id. at 20-21. "Had Dr. Espino not discontinued the therapeutic diet, [Plaintiff] would not have qualified for a vegan or [Certified Food Option (CFO)] RDP to accommodate his religious dietary preferences." Id. at 21. According to Espino, Plaintiff "was not entitled to a therapeutic diet," so all Plaintiff "had to do was choose between a vegan diet to accommodate his religious beliefs or request a CFO—neither of which implicated Dr. Espino." Id. at 21.

Finally, Espino argues that Plaintiff cannot "produce[] any evidence beyond his own conclusory allegations" that Espino retaliated against him. Id. at 23 (quotations and citation omitted). Instead, Espino "acted based on the exercise of his medical judgment—not in retaliation." Id.

In support of his position, Espino submitted Plaintiff's medical and mental health records; the Declaration of Brenda Patterson, a Public Health Nutrition Consultant for the FDOC; and Espino's Declaration. Ms. Patterson declares as follows:

> I am employed by the [FDOC] as a Public Health Nutrition Consultant. I have been employed in this role since May 2016. I am also a licensed dietician and have held my license since 1990.

As a Public Health Nutrition Consultant, I and my colleagues are responsible for devising diets for inmates in the custody of the [FDOC] that meet federal and state nutrition guidelines.

This includes devising meals for inmates with standard diets, as well as meals for inmates with special dietary needs or preferences. For instance, I and my colleagues devise certain alternative diets, such as non-meat and vegan diets, to make sure they meet nutritional guidelines. I and my colleagues also devise standard and non-standard therapeutic diets for inmates with certain medical requirements, such as a low-fat diet, low-residue (or low-fiber) diet, etc.

While I devise meals to meet various dietary needs and preferences, I am not responsible for prescribing therapeutic diets or ensuring inmates get diets that meet their preferences. Instead, [FDOC] policies govern how various non-standard diets may be accessed by an inmate.

One category of non-standard diets that an inmate may receive are therapeutic diets. Therapeutic diets are prescribed [by] physicians, clinical associates, or dentists for medical reasons and are designed to meet the requirements of a given medical condition. This is explained in [FDOC] Procedure 401.009, attached as Exhibit 1.

Therapeutic diets can be standard, meaning prescribed from an approved list of therapeutic diets, or can be non-standard or specialized. Exhibit 1 at (1)(f), (2), (4)(b), and (4)(k). A specialized therapeutic diet may be prescribed for medical purposes not addressed by standard therapeutic diets, such as addressing the need for a combination of therapeutic diets. Exhibit 1 at (1)(f). Before a prescription can be written, though, the need for the diet must be discussed with the Chief Health Officer/Institutional

9

Medical Director and a Public Health Nutrition Consultant, and the prescription must be approved by a regional medical director o[r] the statewide medical director. Exhibit 1 at (4)(k).

Standard therapeutic diets must be served according to the therapeutic diet menu without additions or deletions. For example, a standard therapeutic diet cannot require fruit be served at all meals. Exhibit 1 at (2).

While therapeutic diets can be prescribed by medical providers, the medical providers do not devise the meals an inmate receives. Instead, the inmate would receive the meals devised by myself and my colleagues for the prescribed therapeutic diet.

While specified medical providers can prescribe therapeutic diets to meet medical needs, therapeutic diets cannot be prescribed to meet religious dietary preferences, as [RDPs] are handled separately.

As it pertains to [RDPs], there are three subcategories, as explained in [FDOC] Procedure 503.006, attached as Exhibit 2.

First, there is a meat alternative provided with every meal that can be requested by any inmate at any time. Exhibit 2 at (2)(a).

Second, an inmate may request a vegan meal plan from the Food Service Director at the facility where the inmate is housed. Exhibit 2 at (2)(b).

Third, an inmate may request a [CFO] from a [FDOC] chaplain. Exhibit 2 at (2)(c). An inmate is not eligible to receive a CFO diet if the inmate "has a medical or mental health condition that requires a prescribed therapeutic diet." Exhibit 2 at § (3)(e)(2). In

this sense, therapeutic diets to address medical needs trump an inmate's request for an RDP.

If an inmate is prescribed a therapeutic diet, the inmate may still request the alternate, non-meat entrée being offered for a particular meal. As such, an inmate with a therapeutic diet for which a meal contains meat can still receive a meal with a meat substitute if their religious beliefs prohibit eating meat. Or an inmate can request a vegan diet from the Food Service Director if they want the vegan diet instead of the prescribed therapeutic diet.

For purposes of this lawsuit, I have been asked to review Plaintiff Nyka O'Connor's requests for specific diets.

The diet requested by inmate O'Connor was not authorized under the [FDOC] policies and procedures. Mr. O'Connor's request for a religious diet would have been classified as a CFO request since he rejected the meat alternative entrée and vegan diets as options that met his religious dietary needs.

As explained in [FDOC] Procedure 503.006, inmate O'Connor's request for a CFO plan was subordinated to his medical needs pursuant to the therapeutic diets he requested and that were prescribed by Dr. Espino. Inmate O'Connor could have requested the meat alternative entrée with his therapeutic diet to accommodate his religious beliefs. If the therapeutic diet with meat alternative entrée option did not meet inmate O'Connor's medical needs and religious preferences, inmate O'Connor would have had to choose between being prescribed a therapeutic diet or requesting a vegan or CFO RDP, pursuant to [FDOC] policy. Put simply, Dr. Espino had no ability to prescribe a non-standard therapeutic diet tailored to inmate O'Connor's religious dietary preferences.

11

Further, the specific diet inmate O'Connor wanted—a combination of two standard therapeutic diets (low-residue and low-fat diets) coupled with a vegetarian diet that complied with his SYDA-Jewish beliefs—could not be provided.

As it pertains to his request for both a low-fat and low-residue therapeutic diet, it would be difficult to devise a diet satisfying the nutritional requirements of both therapeutic diets. However, such a diet could be devised if it was medically necessary.

But although possible to devise a nutritionally sound diet based on a combination of therapeutic diets, it is not possible for the [FDOC] to have devised such a combination that also meets inmate O'Connor's purported religious dietary restrictions. According to inmate O'Connor, his SYDA-Jewish beliefs require a diet consisting of "peanut butter, bread, cereal, milk, whole fruits, vegetables, etc.," and prohibits eating "meat, fish, eggs, sour foods like cheese, etc." The SYDA-Jewish diet described by inmate O'Connor is high in fiber, and, therefore, conflicts with the requirements of a therapeutic low-residue (i.e. low-fiber) diet. **As such, a diet meeting all the preferences expressed by Mr. O'Connor could not be devised and meet the required nutritional guidelines.**

Lastly, as to inmate O'Connor's allegation that the diets he was provided were nutritionally inadequate, that is a mischaracterization of the nature of the diets he requested. As explained above, there is a standard diet that meets federal and state nutritional guidelines. Alternative entrée options, vegan options, and CFOs also meet these federal and state guidelines.

12

Therapeutic diets, though, necessarily differ from the nutritional guidelines by their very nature. For instance, a low-residue therapeutic diet has less fiber than recommended by nutritional guidelines because an inmate prescribed a low-residue diet needs less fiber for medical reasons. But a low-residue diet meets the nutritional guideless in all other respects. As such, therapeutic diets differ from nutritional guidelines pursuant to the medical needs they are intended to address. So although true that therapeutic diets do not satisfy every part of the nutritional guidelines, the reason for the departure is to meet the special nutritional requirements of the inmate prescribed the therapeutic diet. That does not mean, however, that a therapeutic diet is nutritionally inadequate for the inmates receiving it.

To the extent inmate O'Connor faults Dr. Espino for his meals failing to meet nutritional guidelines in other ways, such allegations incorrectly presume Dr. Espino played a role in devising or preparing meals. Medical providers are not responsible for ensuring meals meet nutritional guidelines; rather, they are only permitted to prescribe therapeutic diets based on the [FDOC] procedures and have no say in what the actual meals will be.

Doc. 116-6 at 2-7 (paragraph enumeration omitted and emphasis added).

Patterson attached Procedure Number 401.009, Prescribed Therapeutic Diets, id. at 9-17; and Procedure Number 503.006, Religious Diet Program, id. at 19-26, to her Declaration.

Additionally, Espino avers as follows:

I was employed as medical director at Florida State Prison in 2017, working pursuant to Centurion

of Florida, LLC's contract with the [FDOC]. I no longer work with Centurion.

As medical director, I oversaw the medical doctors, physician assistants, and nurse practitioners who worked at Florida State Prison ("FSP"), excluding mental health professionals. I also saw patients and provided medical care to them.

In my role as medical director and as a treating physician, I reviewed and was responsible for making medical records regarding patients.

For purposes of this litigation, I have reviewed medical records related to patient Nyka O'Connor (DC# 199579) from the period when he was transferred to FSP in December 2016 until December 2017.

When Mr. O'Connor was transferred to FSP, he was seen by Dr. Chuong Thanh Le for gastrointestinal complaints. Dr. Le prescribed medications and a therapeutic diet pass to Mr. O'Connor for a low-fat ("fat intolerance") diet. Mr. O'Connor, though, continued to complain despite the treatment and therapeutic diet prescribed to him.

On May 4, 2017, Mr. O'Connor declared a hunger strike and was placed in [self-harm observation status (SHOS)] for observation. At this point, Mr. O'Connor was placed under the care of mental health doctors. According to those records, Mr. O'Connor did not take his prescribed medications while on the hunger strike because some of the medications were to be taken with food.

On May 8, 2017, Mr. O'Connor's mental health records indicate he told his providers that he "refused to eat until he's given [']medical diet.[']" At that point, I was asked to see Mr. O'Connor in SHOS.

14

I evaluated Mr. O'Connor on May 8, 2017. This was the first time I interacted with Mr. O'Connor since his transfer to FSP. Mr. O'Connor told me he wanted to eat what was in his religious beliefs. He also detailed his gastrointestinal issues. He agreed to end his hunger strike if I changed his diet to a low residue ("low fiber") alternate with no eggs or meat. Based on this evaluation and in an effort to end his hunger strike, I wrote Mr. O'Connor the therapeutic diet he requested.

Mr. O'Connor was released from SHOS a few days later and had no medical complaints of any kind until June 6, 2017.

On June 6, 2017, Mr. O'Connor submitted a sick call requesting that his diet pass be changed. In addition to a therapeutic low residue alternate with no eggs or meat, Mr. O'Connor also wanted a diet pass that did not include cheese.

Pursuant to FD[O]C's policies, I was unable to prescribe the diet requested by Mr. O'Connor for several reasons. First, as a medical doctor, I was limited to prescribing therapeutic diets. While I could prescribe a therapeutic diet, I had no say in what meal would be provided; FD[O]C dietitians were responsible for devising the specific meals to meet the nutritional guidelines of the therapeutic diet prescribed.

Second, therapeutic diets are used to address medical needs, not religious dietary preferences. As such, I could not prescribe a diet based on Mr. O'Connor's religious dietary preferences when there was no medical need for doing so. Mr. O'Connor's request for a diet that did not include cheese was not, in my opinion, medically necessary.

15

Third, while I could prescribe a therapeutic diet with an "alternate," FD[O]C's policies regarding [RDPs] indicated that an "alternate" diet meant a meat substitute would be provided. There is no "alternate" diet that includes a cheese substitute.

For these reasons, I could not prescribe a therapeutic diet that met Mr. O'Connor's medical needs and religious preferences.

Since Mr. O'Connor had not complained of gastrointestinal issues since ending his hunger strike, I believed his gastrointestinal issues to have resolved. As such, I discontinued his diet pass on June 12, 2017, and advised Mr. O'Connor that he should either request a vegan meal from Food Services or contact the chaplain about getting on an RDP to get a meal that met his religious preferences.

On June 14, 2017, Mr. O'Connor came to medical and accused me of not taking care of him because his therapeutic diet had been discontinued and his prescription for Tums had not been renewed.

I conducted a more thorough review of Mr. O'Connor's gastrointestinal history, including his complaints of gallstones and history of swallowing paper clips. I reviewed a recent colonoscopy as well a scan of his gall bladder. Based on my evaluation, Mr. O'Connor did not have any significant clinical indication for a therapeutic diet.

This was the last appointment I had with Mr. O'Connor through August 2017.

From April through August 2017, I only saw Mr. O'Connor twice—on May 8 and June 14.

Based on my evaluation and in my medical opinion, Mr. O'Connor did not suffer from any

16

gastrointestinal issues that required a therapeutic diet or medication. More specifically, although Mr. O'Connor requested a low residue diet, there was no medical need for such a diet.

Despite Mr. O'Connor's allegations, and as confirmed in the medical records, Mr. O'Connor never requested I prescribe him a low-fat diet. Mr. O'Connor had a low-fat diet pass prescribed by Dr. Le when he went on the hunger strike, and requested that I prescribe a low fiber diet with no eggs or meat. Regardless, nothing in my evaluation of Mr. O'Connor indicated that a low-fat diet was medically necessary.

Because neither the low-fat nor low fiber diet was medically necessary, there was also no indication that a non-standard combination diet consisting of low-fat and low fiber therapeutic diets was medically necessary.

I provided all treatment to Mr. O'Connor that, in my opinion, was medically necessary. And I did not base any of my treatment decisions on anything except my evaluations of Mr. O'Connor and the exercise of my medical judgment.

Doc. 116-5 at 2-6 (paragraph enumeration omitted).

Plaintiff's medical and mental health records reflect as follows. Plaintiff was transferred to FSP on December 27, 2016. Doc. 145-1 at 1-2. On December 30, 2016, Dr. Le saw Plaintiff and prescribed Plaintiff a fat intolerance diet. Id. at 3; see also Doc. 116-5 at 3. On January 2, 2017, Plaintiff wrote a sick-call request that included several unrelated complaints, one of which related to his "gastro" issues and his "entitle[ment] to a non-standard therapeutic diet, e.g.

Low Res – Fat Intolerance – 4000 – Vegetarian combined." Doc. 145-1 at 4. On January 6, 2017, the sick-call was returned to Plaintiff because he wrote it "in the tiniest writing that filled the entire form." Id. at 5. He was advised to resubmit the request in legible handwriting so that medical could accurately assess his complaints. Id. Plaintiff was "in no acute distress" and did not voice "any complaints that required immediate medical attention." Id.

On February 6, 2017, Dr. Le saw Plaintiff, and Plaintiff was complaining about abdominal pain after eating. Id. at 9. Dr. Le provided Plaintiff with medication and ordered tests. Id. at 9, 14. On March 10, 2017, Plaintiff refused to undergo the ordered tests. Id. at 15, 50. Plaintiff returned to medical on March 17, 2017. Id. at 17. The medical note indicates that Plaintiff was "continually refusing labs" but he apparently agreed to do the tests and Dr. Le scheduled a follow-up appointment for April 5, 2017. Id. Plaintiff, however, refused the follow-up appointment on April 5, 2017, indicating that he was "no longer waiting in restraints in cage for hours." Id. at 51.

On April 7, 2017, Plaintiff reported to mental health staff that he was "stressed out about everything" and "upset about receiving the wrong diet." Doc. 145-4 at 33. He apparently reported that his low residue diet had been changed. Id.

18

On April 23, 2017, and May 4, 2017, Plaintiff wrote three sick-call requests. Doc. 145-1 at 19-21. On the April 23 request, Plaintiff complained about Defendant Robinson ignoring his complaints the day before (April 22, 2017) during the morning medication rounds. Id. at 19. A note dated April 23, 2017, reflects that Plaintiff's sick-call request was triaged as "routine" and he was not showing any signs or symptoms of distress. Id. On one of the May 4 requests, he stated that his "diet pass [wa]s not compliant with [his] health [and] religion," so he was going on a hunger strike and refusing all medications because he cannot take medications on an empty stomach. Id. at 20. He further noted that he saw Dr. Asevera on May 3, 2017, and specifically advised him not to write a fat intolerance diet pass. Id. Instead, Plaintiff requested a "non-standard therapeutic diet which combines Low Res – Fat Intol – Vegan in one." Id. Dr. Asevera advised that he would "look into" it, but he still wrote Plaintiff a fat intolerance diet pass. Id. In the second sick-call request, Plaintiff advised that he feared for his life because "staff [was] trying to kill [him] via deficient food [and] threats to abuse." Id. at 21. He reiterated that he would refuse all medications while on the hunger strike. Id. Nurse Burgin noted on all three requests that Plaintiff refused an assessment on May 4, 2017. Id. at 19-21. That same day (May 4, 2017), Plaintiff was placed on SHOS due to "suicidal ideations, hunger strike, [and] paranoia." Doc. 145-2 at 1, 3. At that time, his

19

medications were prazosin, Cogentin, Risperdal, Zoloft, Colace, Zantac, Fiber-tab, and Protonix. Id. at 4. On May 8, 2017, Plaintiff advised mental health staff that he "refused to eat until he's given 'medical diet.'" Id. at 37. Mental health staff referred Plaintiff to medical for his gastrointestinal complaints and diet request. Id. at 38.

Defendant Espino became involved in Plaintiff's care on May 8, 2017. Id. at 42. Espino's note reflects that Plaintiff "just want[s] to eat what is in his religious beliefs like – no eggs / no meat" and Plaintiff "agrees to eat if [Espino] change[s] his diet to Low Res/alternate with NO eggs/meat." Id. Thus, Espino changed Plaintiff's diet to "Lo-Res/Alternate NO eggs/meat." Id.; see Doc. 145-3 at 1.

On May 15, 2017, Plaintiff complained to mental health staff that his diet was "still not right." Doc. 145-4 at 44. He advised that he was thinking of going on another hunger strike because his meal trays still contained meat. Id. at 47.

On June 6, 2017, Plaintiff submitted a sick-call request indicating that his "diet pass need[s] correction" to add "no cheese" or a new pass for a "low residue alternate – no dairy" because "alternate covers no meat [and] no dairy covers no eggs [and] no cheese." Doc. 145-1 at 26. He asserted that cheese violates his religious beliefs and "contribute[s] to [his] sour stomach, acid

reflux, heartburns, etc." Id. He also requested that his pass to keep Tums on his person be renewed. Id. A FDOC stamp on the sick-call request dated June 6, 2017 at 0700 hours reflects that Plaintiff's request was triaged as "routine." Id.[5]

In response to his sick-call request, on June 12, 2017, Espino discontinued Plaintiff's "Low Res Diet due to [Plaintiff's] Religion," and he advised Plaintiff that he can speak to a chaplain about an RDP or ask the kitchen for a Vegan diet. Id. at 27; Doc. 145-3 at 1. On June 14, 2017, Espino saw Plaintiff and noted that Plaintiff was accusing him of "'not taking care of him.'" Doc. 145-1 at 28. Espino further noted that Plaintiff had a negative colonoscopy in May 2016, and a normal HIDA scan for his gallbladder. Id. Plaintiff was "argumentative [about] his diet [and] Tums," but Espino found "no clinical significant indication for treatment." Id.

On October 2, 2017, Plaintiff submitted a sick-call request unrelated to his diet, but refused his sick-call assessment on October 12, 2017, advising the

---

[5] On June 7, 2017, Plaintiff submitted a formal grievance complaining about his diet. Doc. 146-7 at 2. He attached to the grievance a sick-call request dated May 30, 2017, complaining about his diet pass. Id. at 3. Plaintiff contends in the June 7, 2017 grievance that he submitted the May 30, 2017 sick-call request to Nurse Johnson in a sealed envelope, and he asked "Nurse C" on June 6, 2017 about the sick-call "to no avail." Id. at 2. Thus, Plaintiff submitted the June 6, 2017 sick-call request raising the same issues. He also acknowledges that nurses, not doctors, are responsible for assessing inmates in response to sick-call requests. Doc. 146 at 6-7.

nurse that he was okay. Id. at 35-36. He submitted another sick-call request on October 22, 2017, advising that "[f]or years, FSP has had problems with the plumbing/pipes," which causes "black oily particles" in the water. Id. at 37. He asserted that when he drinks the water, it causes his throat to burn which "aggravate[s] [his] burning throat from acid reflux from gastro disability of gallstones, pains/cramp, indigestion, heartburns, etc." Id. He also noted that he receives "deficient meals," and he requested "adequate gastro care" and drinking water. Id. On November 2, 2017, Espino saw Plaintiff in response to his sick-call requests and again concluded that no treatment was indicated. Id. at 40.

### b. Plaintiff's Response and Exhibits

In Plaintiff's Response, he argues that he "is suing Dr. Espino [for] fail[ing] to prescribe a non-standard therapeutic diet that complies with [his] health [and] religious needs, [and] not renewing medications previously prescribed." Doc. 146 at 1. He further claims that Espino "retaliated against [him] twice [and] denied additional care sought." Id. In support of his position, Plaintiff submitted several exhibits. In his Declaration, Plaintiff avers in pertinent part as follows:

> On 5-3-17, I was assessed by FSP's Dr. Asevero for chronic gastro clinic who then prescribed Zanta[c], Protonix [and] Fat Intolerance Diet for 90 days, for O'Connor's gastrointestinal issues of gallstones and

22

gallbladder walls thickening, nausea, indigestion, and inability to breakdown fatty foods. No Tums was prescribed for O'Connor's acid reflux, heartburns, and the like which comes from indigestible carbohydrates such as beans, warranting a Low Residue / Low Fiber Diet, disclosed to Dr. Asevero. Likewise, O'Connor advised Dr. Asevero that his Vegetarian Diet for his religious sincere SYDA Jewish Beliefs require cereal, peanut butter, bread, fruits, vegetables, milk, etc. [and] prohibits meats, fish, eggs [and] sour foods, like cheese. O'Connor sought a non-standard therapeutic diet combining Low Residue – Fat Intolerance [and] Vegetarian Diets in one, to no avail. . . .

On 5-4-2017, O'Connor went on a hunger strike due to meat, eggs, etc., which was served on the Fat Intolerance Tray at breakfast, served to O'Connor. O'Connor refused all meals [and] meds until an adequate non-standard therapeutic diet was provided for his health [and] religious needs. O'Connor was eventually placed in a suicide cell on SHOS . . . .

On 5-8-17, while on SHOS and hunger strike, O'Connor saw Dr. Espino [and] Ms. Graham Food Service Supervisor, in Dr. Espino's office. O'Connor explained to Dr. Espino that he was on hunger strike [due to] meals served, which was contrary to O'Connor's health [and] religious needs, and sought a non-standard therapeutic diet combining a Low Residue, Fat Intolerance [and] Vegetarian diets in one.

O'Connor explained to Dr. Espino that he needed a Low Residue Diet for his inability to adequately breakdown certain indigestible carbohydrates, which cause acid reflux that leads to esophageal cancer [and] tumors, heartburns, indigestion, sour stomach [and] sour belch, etc.

O'Connor explained to Dr. Espino that he needed a Fat Intolerance Diet for his nausea,

cholesterol gallstones [and] gallbladder walls thickening, for which prior Doctors approved surgery in 2015, but surgery was not done, and also advised Dr. Espino that gallstones can clog the gallbladder opening, impair flow, cause infection [and] eruption, spread infection [and] kill O'Connor.

O'Connor explained to Dr. Espino that he needed a Vegetarian Diet for his sincere SYDA-Jewish Vegetarian Belief System which require peanut butter, bread, cereal, milk, whole fruits, vegetables, etc. [and] which prohibit meat, fish, eggs, sour foods like cheese, etc., which O'Connor was subjected to eat.

Dr. Espino advised O'Connor that he could choose and get only ONE diet, and could not get all the 3 above diets combined; so, O'Connor under duress, involuntarily asked for a Low Residue Alternate No Eggs – No Cheese [and] the 2016 colonoscopy [and] HIDA scan weren't issues.

Ms. Graham stated that all Therapeutic Diets have an Alternate [and] that eggs could be replaced with peanut butter. Dr. Espino then wrote a Low residue Alternate No Eggs No Meat Diet pass from 5-8-17 to 8-8-17, instead of initiating the protocol for a non-standard therapeutic diet aforesaid.

At that time, Dr. Espino refused to re-write O'Connor's gastro meds he was taking before the 5-4-17 hunger strike. When O'Connor asked Dr. Espino to re-write said meds Dr. Asevero previously prescribed, Dr. Espino advise[d] O'Connor to start eating before he . . . renews said gastro meds.

On 5-9-17, O'Connor saw Dr. Espino briefly while walking by and again asked Dr. Espino to renew said gastro meds to no avail. Dr. Espino refused to re-write said gastro meds, and O'Connor didn't get any gastro meds while on SHOS 5-4-17 to 5-9-17.

On about 5-11-17, Nurse Johnson renewed the deficient gastro meds that Dr. Asevero prescribed on 5-3-17, but still didn't prescribe Tums O'Connor sought. Said renewed meds were valid through 6-14-1[7] when O'Connor saw Dr. Espino again.

On 5-30-17, O'Connor sought to correct said 5-8-17 Diet Pass to exclude cheese served thereon, contrary to O'Connor's Religion, and cheese contribute[s] to O'Connor's sour stomach, acid reflux [and] heartburns etc. O'Connor sought a Low Residue Alternate No Eggs No Cheese Diet, to no avail, by submitting an Inmate Request with a sick-call [and] SYDA correspondence about Vegetarian Diet needed, sent to Nurse Johnson, to no avail. After receiving no response, O'Connor wrote a sick-call dated 6-6-17 which he submitted to the sick-call nurse. O'Connor then wrote a formal grievance and attached a pink copy of the 5-30-17 [and] 6-6-17 sick-call requests, and submitted same in the grievance box. Said grievance [and] 2 sick-call exhibits were received by Dr. Espino on 6-7-17, according to the Chronological Record of Health Care (Ex. G). As a reprisal for O'Connor writing said 6-7-17 grievance log #1706-205-064 with 2 sick-call exhibits, Dr. Espino discontinued said 5-8-17 diet pass and directed O'Connor to seek an RDP Diet from the chapel or Vegan from Food Service, knowing neither RDP (serves fish [and] beans) nor Vegan (serves animal gelatin in apple sauce, pasta-noodles with eggs [and] beans) would comply with O'Connor's health and religious needs. However, on said chronological health record, Dr. Espino did acknowledge O'Connor was entitled to a diet for his religion [and] fat intolerance. Had O'Connor not written said 6-7-17 grievance [and] 2 sick-calls exhibits, . . . said 5-3-17 diet pass would not have been discontinued [and] voided. Though Dr. Espino acknowledged O'Connor's entitled to a religious diet [and] Fat Intolerance, Dr. Espino never sought to

ensure O'Connor received a non-standard therapeutic diet combining said Vegetarian [and] Fat Intolerance which are allegedly both high fiber diets.

On 6-14-1[7], O'Connor again wrote another grievance log #1706-205-194 with Doc. 121 from . . . case # 3:15-cv-1387-J-32JBT, complaining about his ongoing gastro issues above, being litigated.

On 6-14-1[7], after submitting said grievance, O'Connor was taken to medical to see Dr. Espino again. Coincidentally, another staff member had a video-audio-portable-hand-held camera recording another inmate close to Dr. Espino's office where O'Connor was. Said audio-video camera recorded Dr. Espino falsely advising O'Connor that it's only O'Connor's "perception" of pain [and] cramps etc., that he . . . was experiencing regarding O'Connor's gastro issues. Dr. Espino advised O'Connor that he doesn't have bloody stools in 2017, due to negative results of a colonoscopy [and] HIDA scan results from 2016. O'Connor advised Dr. Espino that blood comes from his hemorrhoids due to straining to defecate hard stools because of no colace (stool softener) O'Connor sought from Dr. Espino, which was denied, and due to deficient meals, hard to digest. O'Connor advised gallstones he has are not in the colon, but in the gallbladder, which colonoscopy doesn't detect. Dr. Espino then advised O'Connor to "shut-up" and calling O'Connor a "smart guy." O'Connor even suggested that Dr. Espino do another order for ultrasound to see if he still had gallstones [and] gallbladder walls thickening like the 2015 ultrasound, since neither colonoscopy nor HIDA scan can detect [and] tell whether O'Connor has gallstones [and] gallbladder walls thickening. O'Connor saw the word "VOID" on said 5-8-17 diet pass in his folder that Dr. Espino was going through, and O'Connor asked Dr. Espino the reason . . . but Dr. Espino did not / could not tell O'Connor any valid reason(s) for said 5-8-17 diet pass being voided.

26

O'Connor advised Dr. Espino that he had just written a formal grievance with Doc. 121 from a pending civil suit about said gastro issues [and] submitted same in the grievance box prior to seeing him. Dr. Espino then got furious, saying O'Connor is suing "us," though O'Connor was suing FDOC Sec and two doctors from RMC . . . at the time. Dr. Espino then said he would provide O'Connor no treatment until he sees the 6-[14]-1[7] grievance and court order (Doc. 121) attached thereto.[6]

During said encounter, O'Connor tried to explain . . . his other health issues to no avail, which Dr. Espino disregarded [and] failed to provide adequate care. . . .

In Dr. Espino's falsified response to grievance log #1707-205-094 (Ex. H), Dr. Espino falsely alleged "there was no such diet as a low residue/alternative therefore the diet (5-8-17 diet) that was written was invalid." However, kindly see Ex-A Therapeutic Master Menu with low residue alternate. This is Dr. Espino's falsified reason for invaliding the 5-8-17 diet. However, Dr. Espino abandoned said reason for the colonoscopy and HIDA scan reason for invaliding said 5-8-17 diet in his Motion for Summary Judgment. Which is it???

Turning to Ms. Brenda Patterson. She failed to explain by what authority Dr. Espino used to write a diet pass for O'Connor on 5-8-17, since Dr. Espino allegedly has no authority to write a diet for O'Connor's health [and] religious needs as falsely alleged.

Brenda Patterson said a Low Residue (Low Fiber) and Fat Intolerance (High Fiber) can be

---

[6] Earlier in his Declaration, Plaintiff stated that he wrote this grievance with the Court's order attached to it on June 14, 2017.

combined, but not with a Vegetarian diet (High Fiber). This makes no sense. See O'Connor's Exhibits D [and] I where Dr. Contarini in 2015 prescribed Low Fat (Fat Intolerance) due to O'Connor needing more Fiber per Dr. Shah in 2015.

Proc. 503.006, where Brenda Patterson said Medical Diets "trump" RDP-Religious Diet. It should be noted that neither Brenda Patterson's, Dr. Espino's, nor any FDOC Procedures words trump FAC 33-204.003(5) [and] see FDOC Michael D. Crews words on 11-5-14 (Ex. B) that O'Connor[] is entitled to a Low Residue – 4000 calorie – Vegan combined. Further, no state law(s) can trump federal law that stated that O'Connor is entitled to a non-standard therapeutic diet in O'Connor v. Backman, et al., 743 F. App'x 373 (11th Cir. 2018).

. . . .

Due to Dr. Espino's delinquencies, unlawful acts [and/or] omissions, denial of adequate health care, denial of right to religion [and] retaliation, O'Connor suffered agitation [and] aggravation of the chemical imbalance in his brain, stress, anxiety, denial of adequate nutrition per USDA standards, weight loss, heartburns, nausea, . . . indigestion, denial of adequate nourishment per USDA, which makes him weak, fatigued, hard to think, caused severe hunger pains, etc. . . .

Doc. 146-14 at 2-10 (some capitalization and punctuation modified).

Plaintiff also submitted some of his grievances and responses thereto. In a July 7, 2017 grievance, Plaintiff complained that Espino failed to appropriately handle his prior grievance. Doc. 146-8 at 6. Espino denied Plaintiff's grievance, noting as follows:

Review of your medical file shows that you were seen by physician on 5/8/17 at 0930; when being seen by medical physician you stated you were on a hunger strike and wanted your diet as you want to eat what is in [your] religious belief, no eggs/no meat. You informed the medical physician that you would agree to eat if your diet was changed to "Low Residue/alternative with no eggs/meat["] due to religious beliefs. There is no such diet as a low residue/alternative therefore the diet that was written was invalid.

There is no documentation showing that you are allergic to eggs and/or meat therefore the provider can write a low residue diet if it is medically indicated.

The court papers submitted do[] not state[] you are to be issued a low residue diet, as it is inquiring about a medical condition to why you state you need the diet.

If you are experiencing medical issues and/or concerns you can access sick call to be evaluated and if medically indicated you will be referred for further evaluation.

Id. at 7.

## IV.  **Summary Judgment Standard**

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). However, "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## V. <u>Analysis</u>

### a. Eighth Amendment Claim - Medications

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" <u>Melton v. Abston</u>, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976)). "To establish a deliberate indifference claim, a plaintiff must show: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury. <u>Roy v. Ivy</u>, 53 F.4th 1338, 1346-47 (11th Cir. 2022) (citing <u>Goebert v.</u>

Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)). As to the first prong, "a serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotations and citation omitted). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotations and citation omitted). As to the second prong:

> [The Eleventh Circuit has] synthesized th[e] "deliberate indifference" inquiry into four elements: (1) the official "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) the official "actually drew that inference," (3) the official "disregarded the risk of serious harm," and (4) the official's "conduct amounted to more than gross negligence." [Valderrama v. Rousseau, 780 F.3d 1108, 1116 (11th Cir. 2015)]. The mere fact that medical care is eventually provided is insufficient to defeat a claim for deliberate indifference. Id. An official may still act with deliberate indifference "by delaying the treatment of serious medical needs." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). But in making the determination of whether any particular delay is unconstitutional, the applicable court must consider "the reason for the delay and the nature of the medical need." Id.

Ireland v. Prummell, 53 F.4th 1274, 1287-88 (11th Cir. 2022) (footnote omitted); see also Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1188-89 & n.10

(11th Cir. 2020) (recognizing "a tension within [Eleventh Circuit] precedent regarding the minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than gross negligence" while others have used "more than mere negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard" (citations omitted)).

"For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011)[7] (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991)); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem). Notably, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v.

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). As such, a complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted).

Similarly, disagreement over the mode of treatment does not constitute deliberate indifference under the Eighth Amendment. See Hamm v. Dekalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985). And "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

Espino contends that he is entitled to summary judgment on Plaintiff's claim that Espino denied him medications. During the relevant timeframe, Espino evaluated Plaintiff twice. During both of the evaluations, Plaintiff contends that Espino failed to provide him with the medications he requested for his gastrointestinal issues.

When Plaintiff was placed on SHOS on May 4, 2017, he thereafter refused to take his medications because he was on a hunger strike and his medications needed to be taken with food. According to Plaintiff's own allegations, when he saw Dr. Espino on May 8, 2017, Espino advised Plaintiff to resume eating before Espino would prescribe him medications. Plaintiff apparently started eating again on May 9 or 10, 2017. See Doc. 145-2 at 49 (noting Plaintiff told staff that he would "start eating all [his] meals today"); id. at 59 (form dated May 10, 2017, indicating Plaintiff stated he was eating all his meals); see also Doc. 146-7 at 2 (grievance written by Plaintiff explaining that his hunger strike lasted from May 4, 2017 through May 10, 2017). Plaintiff began receiving his medications (Zantac, Fiber tab, Ducolax, and Protonix) again on May 11, 2017. See Doc. 146-6 at 2. Thus, Plaintiff was without his "gastro" medications for only one or two days after seeing Espino and resuming eating. Espino's decision to ensure Plaintiff resumed eating before considering whether he needed the "gastro" medications does not rise to the level of deliberate indifference. Nor has Plaintiff shown any harm caused by this brief delay in receiving his medications after he resumed eating.

The next time Espino evaluated Plaintiff was on June 14, 2017. At the conclusion of the evaluation, Espino determined that Plaintiff had "no clinical significant indication for treatment." That Plaintiff disagreed with Espino's

medical judgment does not render Espino deliberately indifferent. See Melton, 841 F.3d at 1224 ("[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment does not support a claim of deliberate indifference." (quotations and citation omitted)). Nevertheless, Plaintiff recognizes that at that time, he "was taking Zantac, Fiber Tab, . . . Ducolax [and] Protonix." Doc. 146 at 13; see also Doc. 146-6 at 3-4 (medication and treatment records for June 2017 showing that Plaintiff was receiving each day Fiber-Lax and Ranitidine (Zantac[8]), along with other medications). According to the records Plaintiff submitted, he continued to receive such medications after June 14, 2017. See Doc. 146-6 at 3-4.

Apparently, Plaintiff's main complaint is that he did not receive Tums. See Doc. 145-1 at 28. But Espino's failure to provide Plaintiff with Tums does not, by itself, amount to deliberate indifference. Additionally, despite Plaintiff's insistence that Espino "stated on 6-14-17 [that Plaintiff] had no health issues," Doc. 146 at 13, Espino's finding was directed specifically to Plaintiff's request for Tums and his diet. And, contrary to Plaintiff's contention, the record does not indicate that Espino said Plaintiff needed a particular diet

---

[8] "Zantac is a brand name of ranitidine." See Drugs.com, available at https://www.drugs.com/availability/generic-zantac.html.

or Tums. Instead, the handwritten note that says "Low res diet, Tums renew" beside the stamp, "Diagnosis," is not written in Espino's handwriting, is clearly contradictory to Espino's finding written underneath that note, and appears to be the reason for Plaintiff's evaluation that day instead of a "diagnosis." <u>See</u> Doc. 145-1 at 28.

Upon due consideration, the Court finds that Espino is entitled to summary judgment on Plaintiff's Eighth Amendment claim regarding his medications.

### b. Eighth Amendment Claim - Diet

Prisons must provide basic life necessities, including adequate food. <u>See, e.g.</u>, <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994). To plead an Eighth Amendment claim, "a prisoner must allege facts that meet both an objective and a subjective standard." <u>Robbins</u>, 782 F. App'x at 803.

> In an imprisonment context, when the "punishment" at issue is alleged to be abusive conditions of confinement, the objective standard looks to whether those conditions were severe enough to rise to the level of cruel and unusual punishment. . . . But only "extreme" deprivations of those basic life necessities constitute Eighth Amendment violations. <u>Hudson v. McMillian</u>, 503 U.S. 1, 8-9 (1992). Thus, a prisoner must plead facts showing that the condition in question was objectively "extreme," meaning that it "poses an unreasonable risk of serious damage to his future health or safety" that "society considers . . . to be so grave that it violates contemporary standards of decency to expose <u>anyone</u> unwillingly to such a risk."

> Chandler, 379 F.3d at 1289 (alteration accepted) (emphasis in original) (quotation marks omitted).
>
> As to the subjective standard, the prisoner must demonstrate that the government actor accused of the abusive conduct was aware that he was acting cruelly. Thus, to satisfy this component, the prisoner must plead facts showing that the defendant prison official acted with deliberate indifference, meaning that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Id. at 1289-90 (quotation marks omitted).

Robbins, 782 F. App'x at 803-04 (internal quotations modified).

"Neither [the Eleventh Circuit] nor the Supreme Court have ever held that the Eighth Amendment requires prison officials to indulge inmates' dietary preferences—regardless of whether those preferences are dictated by religious, as opposed to non-religious, reasons." Id. at 805. Rather, all that is required is "[a] well-balanced meal, containing sufficient nutritional value to preserve health." Hamm v. DeKalb Cnty., 774 F.2d 1567, 1572 (11th Cir. 1985); see LaFevers v. Saffle, 936 F.2d 1117, 1120 (10th Cir. 1991) ("[T]he mere denial of a [Seventh Day Adventist's] requested vegetarian diet is insufficient to establish a cognizable Eighth Amendment claim" because he was not entitled "to obtain the diet of his choice" (quotation marks omitted)); McEachin v. McGuinnis, 357 F.3d 197, 199-201 (2d Cir. 2004) (affirming dismissal of inmate's Eighth Amendment claim that the prison served him a non-religious

38

diet for one week, where the district court found, <u>inter</u> <u>alia</u>, that the plaintiff failed to allege that the food provided was nutritionally inadequate).

Espino seeks summary judgment on Plaintiff's claim that Espino failed to provide him with a nutritionally adequate diet that meets his health needs. However, as shown through Patterson's and Espino's Declarations, Espino had no control over the composition of the foods in the various diet plans; thus, he could not control the "balance" or "nutritional value" of FDOC's diets. Thus, insofar as Plaintiff blames Espino for any nutritional deficiency within the FDOC diets, his blame is misplaced.

Moreover, Espino was not deliberately indifferent for concluding that Plaintiff's requested diet was not medically necessary. On May 8, 2017, Espino provided the diet that he believed Plaintiff requested. Even if the diet was not exactly what Plaintiff desired, it cannot be said that Espino was acting with deliberate indifference.[9] He provided Plaintiff with at least some care in an effort to address Plaintiff's concerns and end Plaintiff's hunger strike. And on June 14, 2017, Espino specifically found that Plaintiff did not medically require

---

[9] Notably, in a June 7, 2017 formal grievance, Plaintiff claimed that the diet pass issued by Espino on May 8, 2017 "was MISTAKENLY written as a Low Residue Alternate No Eggs, No Meat, which should have been a Low Residue Alternate No Eggs – No Cheese or Low Residue Alternate – No Dairy. . . It's plain on the face of the Diet Pass that Alternate (no meat) [and] no meat were written, which is duplicative [and] was a MISTAKE." Doc. 146-7 at 2. Based on his assertions, at the time, Plaintiff believed the pass was simply a mistake.

39

a certain diet. Again, Plaintiff's disagreement with Espino's findings does not mean Espino acted with deliberate indifference.[10]

Insofar as Plaintiff contends that Espino was deliberately indifferent for failing to provide him with his requested diet when other physicians allegedly found Plaintiff was entitled to a specific diet, Plaintiff's contentions are misplaced. Simply because Espino disagreed with another physician does not mean Espino acted with deliberate indifference. See Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1274 (11th Cir. 2020). More importantly, however, it appears that Plaintiff misinterprets and/or draws his own conclusions from the other physician's findings. On August 20, 2015, Dr. Contarini ordered Plaintiff a low fat diet. See Doc. 146-4 at 7. On September 23, 2015, Dr. Shah examined Plaintiff due to his complaints of constipation and abdominal pain, and averred that "[f]or constipation, I [(Dr. Shah)] would not have recommended a low-reside diet because [Plaintiff] needed more fiber, not less." See Doc. 146-9 at 2-3. Neither doctor ordered Plaintiff the diet that he now requests nor did they find that specific diets could or could not be combined.

---

[10] Plaintiff also repeatedly asserts that his gallbladder walls are thickening and refers to ultrasound reports from 2015. The February 20, 2015 ultrasound found that "[t]he gallbladder has a wall thickness of 3.3 mm." Doc. 146-4 at 5. The June 16, 2015 ultrasound found that his "gallbladder wall measure[d] 1 mm in thickness." Id. at 6. Neither report includes an impression that Plaintiff's gallbladder walls are thickening.

Moreover, contrary to Plaintiff's assertions, nowhere in the Eleventh Circuit's opinion does it state that he is entitled to a non-standard therapeutic diet. See O'Connor, 743 F. App'x 373 (finding that, taking O'Connor's allegations in the complaint as true, his allegations about his gastrointestinal problems and the prison's handling of those problems met the imminent danger standard and that the district court should have allowed O'Connor to proceed in forma pauperis). Similarly, Plaintiff contends that former FDOC Secretary Crews stated that Plaintiff was "entitled to a Low Residue – 4000 calorie – Vegan combined" diet; however, a review of Secretary Crews' November 5, 2014 final order denying Plaintiff's petition for rulemaking makes no such finding. See Doc. 146-2 at 2-3 (denying Plaintiff's petition for rulemaking as unnecessary because the administrative code "already allows for non-standard therapeutic diets").[11]

To the extent that Plaintiff argues Espino failed to comply with the FDOC's policies or procedures for non-standard therapeutic diets, a violation of prison policy, alone, is insufficient to state a claim. See Sandin v. Conner,

---

[11] Plaintiff argues that in response to one of his grievances, Espino advised that his May 8, 2017 diet pass was invalidated because there is no such diet as a low residue alternate. To support his position, Plaintiff submitted the FDOC's Master Menu that was revised in August 2015, and he asserts that it contains a low residue alternate diet. In reviewing the menu, the low residue diet does have an alternate entrée listed for some meals, but on other meals, it specifically states "no alternate entrée." See Doc. 146-1 at 2-29.

515 U.S. 472, 481-82 (1995) (recognizing that prison regulations are "not designed to confer rights on inmates"); see also Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000) ("[F]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence.").

Additionally, Ms. Patterson, one of the individuals responsible for creating the FDOC diets to ensure compliance with nutritional guidelines, opined that while it is "possible to devise a nutritionally sound diet based on a combination of therapeutic diets, it is not possible for the [FDOC] to have devised such a combination that also meets [Plaintiff]'s purported religious dietary restrictions." She also concluded that "a diet meeting all the preferences expressed by [Plaintiff] could not be devised and meet the required nutritional guidelines." Thus, even assuming Espino could prescribe the specific diet Plaintiff requested,[12] it could not have been created to meet the required nutritional guidelines.

Therefore, considering the record, the Court finds that Espino is entitled to summary judgment on Plaintiff's Eighth Amendment claim regarding his diet.

---

[12] To the extent Plaintiff argues that Espino cannot rely on any FDOC policies or procedures because the claims against Defendants Inch and Jones have been dismissed, he is mistaken.

### c. First Amendment Claim - Religious Diet

To establish a First Amendment claim under the Free Exercise Clause, a plaintiff must establish that the defendant imposed a "substantial burden" on his sincerely held religious beliefs. See Hoever v. Belleis, 703 F. App'x 908, 912 (11th Cir. 2017); see also Wilkinson v. GEO Grp., Inc., 617 F. App'x 915, 917 (11th Cir. 2015); Hernandez v. Comm'r, 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice[.]")). "[T]he Supreme Court [has] held that a policy substantially burdens a prisoner's religious exercise if it forces him to choose between engaging in conduct that seriously violates his religious beliefs or facing a serious penalty." Robbins v. Robertson, 782 F. App'x 794, 802 (11th Cir. 2019); see Hoever, 703 F. App'x at 912 ("[A] substantial burden occurs if the conduct complained of completely prevents the individual from engaging in religiously mandated activity, or . . . requires participation in an activity prohibited by religion and, at a minimum, must have something more than an incidental effect on religious exercise." (internal quotations and citation omitted)).

Assuming Plaintiff requested that Espino prescribe him the non-standard therapeutic diet referenced in his Amended Complaint, according to FDOC policy, Espino lacked authority to prescribe Plaintiff a diet based on

43

Plaintiff's religious beliefs. Instead, Espino only had authority to prescribe a diet based on Plaintiff's medical needs. Notably, Espino attempted to accommodate Plaintiff's request on May 8, 2017, in an effort to appease Plaintiff's concerns and end his hunger strike. But when Plaintiff complained about the diet Espino prescribed because it included cheese in violation of his religion and Plaintiff's belief that cheese contributed to his gastro issues, Espino canceled it so Plaintiff could seek a diet compliant with his religion from either the chaplain or kitchen staff. Thus, Espino did not substantially burden Plaintiff's sincerely held religious beliefs. Instead, Espino, after finding that Plaintiff did not medically require a specific diet, took action to allow Plaintiff to seek a diet compliant with his religion. And no evidence shows that the meals provided to Plaintiff were nutritionally inadequate. Plaintiff's comparison to the USDA charts is unpersuasive in light of Patterson's Declaration averring that certain FDOC diets may not meet such standards because the diets are meant to address a particular medical need of an inmate.

Espino did not place Plaintiff in a position of choosing between complying with his religious beliefs or facing harm with respect to his health. Accordingly, Espino is entitled to summary judgment on Plaintiff's First Amendment claim about his diet.

### d. Retaliation

"The core of [a retaliation claim brought pursuant to 42 U.S.C. § 1983] is that the prisoner is being retaliated against for exercising his right to free speech." O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011) (per curiam) (citation omitted). It is firmly established that "an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008). Further, it is firmly established that an inmate may pursue a cause of action against a prison official who retaliated against him for engaging in that protected speech. Id. Three elements are involved in these retaliation claims:

> (1) [the inmate's] speech was constitutionally protected; (2) the inmate suffered adverse action such that the [official's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech.

Id.

Plaintiff contends that Espino retaliated against him by voiding his May 8, 2017 diet pass in response to Plaintiff's June 7, 2017 formal grievance. In that formal grievance, Plaintiff acknowledged that the diet pass issued by Espino on May 8, 2017 "was MISTAKENLY written as a Low Residue

Alternate No Eggs, No Meat, which should have been a Low Residue Alternate
No Eggs – No Cheese or Low Residue Alternate – No Dairy. . . It's plain on the
face of the Diet Pass that Alternate (no meat) [and] no meat were written,
which is duplicative [and] was a MISTAKE." Doc. 146-7 at 2. He also
complained in that formal grievance about the nurses not responding to his
sick-call and verbal requests. Id. He attached to the grievance a sick-call
request dated May 30, 2017, complaining about his diet pass. Id. at 3. Plaintiff
contends in the grievance that he submitted the May 30, 2017 sick-call request
to Nurse Johnson in a sealed envelope, and he asked "Nurse C" on June 6, 2017
about the sick-call "to no avail." Id. at 2. He also attached a sick-call request
dated June 6, 2017, complaining about his diet and requesting Tums. Id. at 4.
Plaintiff's formal grievance was returned without processing because an
earlier decision had been rendered on another grievance in which Plaintiff
raised the same issues. Id. at 6.

In apparent response to Plaintiff's grievance, on June 12, 2017, Espino
wrote an incidental note in Plaintiff's medical record that he was discontinuing
Plaintiff's diet "due to [Plaintiff's] Religion." Doc. 146-7 at 5. He explained that
Plaintiff should speak to a chaplain about an RDP or ask the kitchen for a
Vegan diet. Id. Then, Espino examined Plaintiff on June 14, 2017, and

46

concluded that Plaintiff did not have any medical need for a particular diet.[13]
Doc. 145-1 at 28. Thus, insofar as Plaintiff wanted a diet compliant with his
religion, he was free to speak to a chaplain or kitchen staff to request such a
diet.

Simply because Espino took action in response to Plaintiff's grievance
does not mean that Espino acted in retaliation. See Glenn v. Gillis, No. 5:12-
CV-260-RS-GRJ, 2013 WL 4096206, at *6 (N.D. Fla. Aug. 13, 2013) ("A prison
may appropriately respond to the content of an inmate's grievance without
violating the inmate's constitutional rights."). Indeed, prison officials are
required to take appropriate action in response to an inmate's grievances and
requests. Plaintiff was complaining about his current diet pass being deficient,
and Espino acted to correct that. That Espino did not do exactly what Plaintiff
wanted does not mean Espino acted in retaliation. Instead, Espino avers that

---

[13] To the extent that Plaintiff argues Espino retaliated against him for a grievance
Plaintiff filed on June 14, 2017, to which he attached this Court's order from another
case, Doc. 146-14 at 6, his claim likewise fails. Given that Plaintiff submitted the
grievance before seeing Espino that same day, Espino would have only known about
the grievance with the Court's order attached to it if Plaintiff had told him about it
during the examination. And if Plaintiff told Espino that there was an existing Court
order directing FDOC's compliance with treating Plaintiff's alleged gastro issues,
then Espino reasonably declined providing any care until he could see what the
Court's order mandated. If he had done something different, he could have potentially
violated the Court order. But as previously noted, the Court's order simply asked the
FDOC to provide a status update on whether Plaintiff had received surgery. It did
not mandate any treatment or make any findings about Plaintiff's condition.

based on his medical judgment, Plaintiff did not medically require a special diet, so Espino canceled Plaintiff's diet pass so that Plaintiff could seek a diet compliant with his religion—over which Espino had no control. Plaintiff has not shown that Espino's actions in response to Plaintiff's grievance would "deter a person of ordinary firmness from engaging in such speech." Considering the record, the Court finds that Espino is entitled to summary judgment on Plaintiff's retaliation claim.

## VI.   **Espino's Objections to Plaintiff's Evidence**

In light of the Court's findings, the Court need not address Defendant Espino's Objections (Doc. 149). Thus, the Court finds the Objections moot.

## VII.   **Claim Against Defendant Robinson**

### a. **Plaintiff's Motion**

On May 4, 2022 (mailbox rule), Plaintiff filed a Motion for Leave to File Belated Motion for Summary Judgment against Defendant Robinson (Doc. 137). The deadline to file dispositive motions was January 7, 2022. See Order (Doc. 103). The Court previously denied Plaintiff's requests to extend this deadline. See Orders (Docs. 125, 127). Plaintiff argues that he lacked access to his grievances, and because the Court granted his request to extend his deadline to respond to Espino's Motion for Summary Judgment based on the same reasoning, the Court should likewise grant his request to file a belated

motion against Defendant Robinson. Upon review of Plaintiff's Motion and the file, the Court denies Plaintiff's request.

### b. Court's Review

After due consideration, the Court finds that Plaintiff's claim against Robinson is due to be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) (requiring the Court to dismiss a case at any time if the action "fails to state a claim on which relief may be granted").

According to Plaintiff, on April 23, 2017, he "had a serious health need to be referred to a [medical doctor] by Nurse Robinson for his complaints of gastro pains [and] cramps, bloody toilet tissue with stools, [and] large quantity of blood in the toilet [that] she saw." Doc. 57 at 12. Robinson, however, advised Plaintiff "that nothing [wa]s wrong with him because [he] 'waited until the weekend when nobody [wa]s here to complain,'" gave Plaintiff a sick-call form and "nothing more." Id. Plaintiff claims Robinson was deliberately indifferent for failing to refer him to a medical doctor. Id. He further alleges that her "deliberate indifference . . . caused [Plaintiff] injuries of continuous pains, cramps, def[e]cating bloody stools, etc, she witnessed; [and] stress, anxiety, agitation of the chemical imbalance in [his] brain, depression, etc." Id.

Assuming Plaintiff had a serious medical need, Plaintiff's allegations, taken as true, do not suggest that Robinson acted with deliberate indifference.

Plaintiff voiced his concerns to Robinson, and Robinson provided him with a sick-call slip. Plaintiff completed the sick-call slip, but according to Plaintiff's own allegations, he refused the sick-call assessment that Nurse Burgin tried to perform on May 4, 2017, in response to the sick-call slip because Plaintiff was "paranoid." Doc. 57 at 15. Moreover, the day before, May 3, 2017, Plaintiff was examined by Dr. Asevero, who provided him with certain medications and a diet pass. Id. at 12.

Robinson did not ignore Plaintiff's complaints, and her actions, as alleged by Plaintiff, do not amount to care that is "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Nimmons, 409 F. App'x at 297 (internal quotations and citation omitted). Additionally, Plaintiff has failed to allege facts showing a causal connection between Robinson's actions and his alleged injuries. Although Plaintiff blames Robinson for his "continuous pains, cramps, def[e]cating bloody stools, etc, she witnessed; [and] stress, anxiety, agitation of the chemical imbalance in [his] brain, depression, etc.," he refused his sick-call assessment when another nurse tried to address his concerns, and he acknowledges that he was seen by a medical doctor who provided him with medications and a diet pass. His allegations do not suggest a causal connection between Robinson's "refusal" to refer him immediately to a doctor and any

injury. Nor do they suggest the alleged delay in treatment caused him harm. Accordingly, Plaintiff's claim against Robinson is due to be dismissed.[14]

Accordingly, it is

**ORDERED**:

1. Espino's Amended Motion for Summary Judgment (Doc. 145) is **GRANTED**.

2. Espino's Objections to Plaintiff's Summary Judgment Evidence (Doc. 149) is **MOOT**.

3. Plaintiff's Motion for Leave to File Belated Motion for Summary Judgment against Nurse Robinson (Doc. 137) is **DENIED**.

4. All claims against Defendant Nurse Robinson are **DISMISSED for failure to state a claim**.

---

[14] Plaintiff included similar allegations against Robinson in his initial Complaint, although he did not name her as a Defendant. See Doc. 1 at 6. After the Court directed him to file an amended complaint (Doc. 43), he included Robinson as a Defendant with similar allegations. The Court finds any further amendment would be futile. See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1132 (11th Cir. 2019) ("Our cases make clear that a [pro se] plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice—at least, that is, where a more carefully drafted complaint might state a claim." (internal quotations and citation omitted)).

5.     The **Clerk** shall enter judgment in favor of Defendant Espino and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 23rd day of March, 2023.

_____
BRIAN J. DAVIS
United States District Judge

JAX-3 3/23
c:
Nyka O'Connor, #199579
Counsel of Record
Nurse Deshika Robinson

52